1 0 8 3 3 7 5 S & C Electric Co. v. Mericlin Counsel, you may proceed. May it please the Court, Attorney Rerato, my name is Robert Makarowski, and I bring this appeal on behalf of my client, S & C Electric. It's the position of my client that Mr. Mericlin failed to establish a causal connection between the work accident of September 11, 2002, and his rotator cuff tear that the commission found to be work-related. We believe that's against the manifest weight of the evidence. We believe that you will agree that the opposite conclusion is clearly apparent after you hear the argument and read the brief, and that you will reverse the industrial commission. There is some undisputed facts in this case. There is no question that prior to the injury in question, Mr. Mericlin did have a prior right rotator cuff repair. His counsel in the brief describes it as a massive repair in Guatemala. He started working for S & C Electric on February 14, 2000. On August 13, 2001, he came to our occupational health department complaining about problems with his right shoulder. He did go to a doctor of his choice, and we at that time put him on a restricted duty, no overhead lifting, no lifting more than 10 to 25 pounds. That restriction, according to the occupational health department, remained in place until September 11, 2001. On September 11, 2001, Mr. Mericlin was working. He bent down to pick something up. In the process of getting back up, he struck his right shoulder against a piece of machinery. That's not disputed. We did agree that he did sustain an accidental injury on that date. In terms of the medical care, he was initially seen at health service where he was complaining about mild pain and was sent to St. Francis Hospital. The next day, he saw Dr. Schlomberg, and Dr. Schlomberg did take a history from him. The petitioner said that he struck his arm against a piece of machinery. Dr. Schlomberg asked him about use of arm, and he indicated at that time that he could reach up to a high shelf, that he could wash his back, that he could put his coat on, and that he could do toiletry needs. Dr. Schlomberg did examine him. He found loss of motion. He found a surgical scar from the prior surgery, and he found significant atrophy. Dr. Schlomberg opined at that time that his condition was chronic, and that the atrophy that he found could not develop over a course of a few days. An MRI was done September 16, 2001. That MRI was five days after the injury. The radiologist's interpretation was chronic changes, chronic tear, degenerative nature. Dr. Schlomberg did actually look at the actual films, and he agreed with the radiologist's opinion. Since 2001? 2002? 2002, Your Honor. Okay. I'm sorry. Go on. Dr. Levy then took over the care of Mr. Marroquin. Mr. Marroquin was initially examined by him November 4th. What did the radiologist say on the MRI report? The MRI revealed chronic changes, degenerative in nature. Large tear of the tendon, very small part of subchromic bursal fluid. And what was his belief, the findings were due to a chronic tear? Correct, Your Honor. Or possibly degenerative in nature? Correct, Your Honor. Okay. Go on. He went to see Dr. Levy on November 4th. Dr. Levy took a history from Mr. Marroquin. Dr. Levy did not review any of Dr. Schlomberg's records or the health service records. And Dr. Levy did take a history from Mr. Marroquin. And Mr. Marroquin said he had no problems with his right shoulder prior to September 11th, 2009. He was unaware of any of the prior complaints that Mr. Marroquin made in August of 2001. He was unaware of the fact that he was on restricted duty with a restriction of no overhead lifting. We took the testimony of Dr. Schlomberg live before the arbitrator. He came pursuant to subpoena. He testified that he's been an orthopedic surgeon for 35 years. Wait a minute. Did you miss something? Didn't Levy operate on him? He did. We'll get to that, too, before we get to Schlomberg's opinions. Right. And I will get to that when he testifies. I was going to bring that up. Dr. Levy did do surgery. That's correct, Your Honor. But in terms of the testimony, Dr. Schlomberg testified he did one to two rotator cuff repairs a week. He testified that based upon the MRI finding that there was retraction of the edge that takes a long time to develop, not just days. He testified that the MRI findings also revealed osteophytes, and those take time. He actually got to saw a reenactment of the injury that was demonstrated to him where the petitioner raised up and struck his shoulder, and he said that could not have caused the findings on the MRI or at the time of operation. He did review the operative records, and in answer to the question, can someone function with a significant tear over a long period of time, he testified, yes, it was chronic because the deltoid muscles become stronger and compensate. He said that when you have this type of tear that's existing for a period of time, you will develop arthritis. And I remember when he went to see, Mr. American went to see his physician after August of 2001 prior to this injury, his physician diagnosed him with arthritis in the right shoulder. So I think we're familiar with that. Why don't you tell us what happened during the operation and what Levy's opinions were. Okay. Dr. Levy did testify, and on arbitration testified that he felt that the operative findings were both chronic and acute. And the commission in reversing arbitrator Andrews, they cherry-picked that statement. But when you look at when his counsel, Mr. Rareda, confronted Dr. Levy with the actual operative report, and I believe it's on page 907, Dr. Levy was only able to find chronic changes. He couldn't find, when he was confronted with his own operative report, and I think this is very important, he couldn't identify acute changes. He was only able to identify chronic changes. Didn't Levy opine that the accident was the cause of the claimant's massive rotator cuff tear? Didn't Levy testify? He did testify. He leaved his stuff out, counsel. Stop a minute. You are required when you give us a statement of facts to give us a fair statement of facts. You totally ignored the fact that the guy had an operation. You totally ignored the fact that Levy had any opinions. And you went in to Schlumberg's testimony at arbitration. You skipped all of this stuff. And in my brief, Your Honor, if you look, I set forth every single fact. Let's take it in order. Levy operated on it. Levy operated on it. That's correct. Levy testified that he found chronic and acute changes. That's the operative report. Massive rotator cuff tear of the right shoulder, a distal clavicle resection was done, an extension of the osteophytes of the hemorrhoid head is what he did. Right. And I don't disagree with that. Those were the operative findings. But when you look at what the commission did, the commission cherry-picked in reversing Arbitrator Andros' decision, the testimony of arbitrator. What did Levy testify to when he was deposed? That the claimant sustained an injury on September 11th that was the cause of his massive rotator cuff tear. He opines that the claimant suffered a fresh tear combined with an old injury. That's his opinion. That was his testimony, Your Honor. But when he was confronted with his operative report, petitioner's counsel confronted him with his own operative report, and it's on page 907 of the record, he could not identify any acute changes. He was only able to identify chronic changes. And when he was cross-examined, he admitted that the degenerative changes predated. He admitted that the osteophytes predated. He admitted that the osteophytes could have been the cause of the rotator cuff tear. He made all of those admissions. When he initially testified, or initially saw this person, he knew nothing about the prior restrictions, nothing about the prior complaints. When you look at the commission's decision, they only mention his testimony where he says the operation showed chronic and acute. They ignore, and his own testimony contradicts that statement. They ignore the fact that when he was confronted with his own operative report, he was not able to identify any acute changes. Did he testify that the osteophytes he observed during surgery could have caused a tear in the rotator cuff? He did, Your Honor. But not a massive rotator cuff tear? And that he testified for a massive rotator cuff tear formed there had to be an injury? Did he testify that? I don't believe he did. I think he did. Okay. I believe when you look at his operative report, he can't find any evidence of an acute injury. No doubt about it. He goes the way the commission went. He also can't, Your Honor, but he discredits his own testimony. He said the surgery revealed acute, which they adopted, and chronic. He was only able to, when he looked at the operative report, show chronic. When he testified that the injury caused the massive rotator cuff tear, he assumed that there must have been some abduction of the arm. That's his testimony, and that's what the commission adopted. Yet there's no testimony by the petitioner of any abduction of the arm. There's no medical record to support that he abducted the arm. Every place where the commission cites to reverse arbitrator Andros, they cherry-pick a statement from him and don't look at what he subsequently said. Every single physician in this record, Dr. Schlomberg, the radiologist, Dr. Sagerman, said that there was retraction that takes time. Dr. Schlomberg said, and he was an initial treating doctor, that that retraction and rotator cuff tear was there for years. Dr. Sagerman said that those changes were there for a long period of time. And Dr. Levy contradicted himself on his opinion when he actually looked at the operative report. He could say one thing when he's testifying, but when he's confronted with his own records and he changes his position. He only changed it. He said he didn't find it. Didn't find it. But his testimony was it was there, that he observed it during surgery. And then he's confronted with the operative report and he said find it, and he's unable to find it. He can't find it. Okay. He's testifying from memory. He's testifying from memory, Your Honor. It's all weight, counsel. There's no question about it. It is, but he's contradicted. It's got to be credible evidence in a credible way. He's contradicted by his own operative report. And he's also contradicted himself, remember, when he says, when he second guesses himself on his opinion, and the commission didn't put this here, he says, you know, it could be due to the repetitive nature of his injury. He contradicts, he questions himself. And the operative report doesn't lie. The MRI doesn't lie. The osteophytes he admitted were present prior. Could have caused the rotator cuff. The degenerative changes were there prior. Could have caused the rotator cuff. He's inconsistent in his opinion. His own records and documents and diagnostic studies show that he's inconsistent. The commission ignored that inconsistency, didn't address it. Now, I argued in my brief, and you recently decided, you know, I argued extra scrutiny. And you recently decided the Holstny case. And in that case, you cited Supreme Court decisions of Zarley, of Berry, and of Paganellis. And I've been practicing since 1974 in this area. In 1981, when Zarley was decided, we had the ability to go before the commission and offer additional evidence. It was trial de novo. We could put in additional evidence. They were a trier effect. In 1984, when Berry was decided, we could also introduce additional evidence before the commission. The commission was a trier effect. It was a trial de novo. In 1989, when Paganellis was decided, they were also a trier effect, and it was a trier de novo. But I don't think that when Holstny was argued before you, and when I read Holstny, you know, I had a sudden flashback, because I remember putting in evidence before the full commission. I went back to the Act and looked at it. And if you look at Section 19E of the Act, Section 19E of the Act says, in all cases in which the hearing before the arbitrator is held after December 18, 1989, no additional evidence shall be introduced by the parties before the commission on review of the decision of the arbitrator. After December 18, 1989, which was after the three Supreme Court cases were decided, we could no longer – Counsel, your time is up. You have time on the clock. Okay. We could no longer put in additional evidence. Counsel? May it please the Court, my name is Ivan Rueda. I represent the appellee. Mr. Marroquin is with us in the first row. Yes, these aggravation of a preexisting type condition case is quite a bit of difficulty for the legal system. But in the end, the commission came down with respect to causation in favor of the petitioner, Mr. Marroquin. And there is evidence in the record that gives a rational basis for the commission's decision, and that the incident of September 11, 2002 was at least one of the causes of the pathology that's relevant to us. We know that Schlamberg and Segerman testified, obviously this was a preexisting condition. Levy testified in favor of your client, the claimant. He seems to be saying, however, that you've got two witnesses on the other side. You've got Levy as a treating physician, but Levy is inconsistent. He contradicts himself. How does that – what's your reaction to that? Well, let's assume for purposes of argument that there is a contradiction. I'm not sure I agree with that, but let's assume it is. That's something for the fact finder to assess and decide whether that testimony survives or not, to support their proposition. Well, I understand that, but it was arbitrary. And it's a very high hurdle, but if you follow the logic, you've got two doctors who clearly state one opinion. I mean, they agree. You've got somebody else on the other side who's, if it's true, is completely inconsistent as to causation. Okay. Can it be argued that the opposite inclusion is apparent? Because you've got somebody who's contradicting and you've got two positive testimonies. How is that not against the manifest way? If numbers were the whole solution, there's a point. But here we have that circumstantial evidence, Judge. And I think it's a real chief feature of the probativity of the claimant's case. Can you answer the question as to whether or not, in support of your case, whether or not Levy is inconsistent? Okay. He's inconsistent. My reading, and I refreshed my memory on this this morning, my reading of it is that he does give aspects of his opinion that may, a petitioner may be able to claim his hat or, you know, it is in our theory in this case. But there's a repetitive accidental theory that he does tie the movements of petitioner's work to the possible development of this type of pathology. So that would be inconsistent, but actually I don't know how respondent benefits from that below, if it's another cause outside of the acute cause. With respect to his opinion that there was an acute element to the pathology he viewed at surgery, it may be viewed as inconsistent that he's not able to testify forth or directly with respect to that question posited by myself, as counsel is characterizing it, if we're going to assume it's inconsistent. But testimony, the expert testimony alone cannot be examined without a look at the circumstantial evidence. And I think these type of cases, aggravations of preexisting pathologies, are perfect cases to look at the circumstantial evidence. And that was the thrust in Markham's brief about this chain of events evidence. One thing that the commission pointed out, and I think it was a big point to them, was that Dr. Edwards Glamber, the day after the accidental event, September 12th, finds a drop sign, a drop sign. And that was on page two, positive drop test. And that's an orthopedic test in which the individual who has that is having trouble lifting the arm that's affected. Dr. Levi finds that same drop test and expressly finds it. And he says it's significant. And I think one good indicator of its significance is that he did debrief Petitioner, Mr. Marroquin, as to the details of his job. And he added the expert layer, the expertise with a basis of knowledge of the job, and he concluded he could not work that job with that drop test. And that's consistent with the circumstantial evidence in this case. So something happened on September 11th, 2002 that aggravated or accelerated the undisputed pathology that was residing in that right shoulder of Mr. Marroquin. And if it's a close factual case, the commission had the right to make that determination. And here the circumstantial evidence is pretty, at least the commission found it, very persuasive. I believe that's what the underlying thrust of the decision reversing the arbitrator was that there was a positive drop test the day after the accident. There was a positive drop test expressly voiced by the treater, Dr. Levi. And there's a circumstantial characterization by Dr. Steven Sklamberg on the 17th, the first contact with Petitioner, that this individual had both qualities. He didn't call it a positive drop test, but he said the individual could not lift his arm anymore. He's having trouble lifting his arm. And in the emergency room, same thing. The medical doctor there, I believe his name is Dr. Goldberg, said the individual's having trouble lifting the arm. He didn't put the label positive drop test, but the same type of indicator of what that is. So the circumstantial evidence shows that he could work plenty of overtime doing that job that uncontested scientific evidence suggests he could not do with a positive drop test. Up to the point of accident, after the point of accident, when he does have that positive drop test, he could not do the job. He was doing one-arm work or he was taking totally off work. So looking at that circumstantial evidence and analyzing the disputed expert testimony using that circumstantial evidence, there's a basis for the commission, a rational basis to have found what it did find on the issue of causation. You know, the other elements of chain of events, circumstantial evidence, we have pain symptomology immediately after the incident, which triggered the prescription by the medical doctors, a Vicodin. And constant medical attention to that right shoulder. Through the hearing date, if I'm accurate, from the 9th, from the date of accident through all relevant times. And we didn't have any significant treatment to their right shoulder. There was one visit, better than one year prior to the date of accident, that involved the right shoulder. And you've heard much testimony, you've read much testimony concerning that date. I never really, I mean, I don't think the commission found it of much consequence, especially with the legal framework that, okay, he went back to his normal job, he did plenty of overtime. So what's the significance of that when the law allows compensation for any incident that causes an aggravation or an acceleration? Okay, it might have hurt. When Mr. Marroquin says he was fine, reading the respondent's briefs, it makes me think that, you know, we live in a black and white world, but for a working man to say he's fine, what does that mean? Maybe he runs a little baguette on it, and he doesn't complain about it, and he goes back to work the next day. And that's a fair interpretation for the commission to draw. He wasn't treated. That arm was functioning. If there was weakness on the surrounding muscle groups to the rotator cuff tear, that's an issue here, he could still do his job, and it still wasn't causing him pathology. So I think the evidence is very strong, absent the contrary expert testimony, which Mr. Marroquin voiced some bias issues in the brief, which I won't go into right here. Without any further questions, I'll tender my time. Thank you, counsel. Counsel, you may reply. Just in response, we don't dispute that he had a rotator cuff. Our doctor said he had that for a long period of time. In terms of the job he was doing for us, he wasn't doing overhead. He was restricted from doing overhead. In terms of the drop test, he would have a positive drop test. He has a rotator cuff tear. The commission adopted Dr. Levy's opinion on causal connection, because Dr. Levy said that the petitioner was fine, had a very good arm prior to. I ask you, how could someone have a very good arm prior to when he had a prior massive rotator cuff tear? That's something the commission awards 35% or 50% for. How could he have a very good arm when he has complaints and arthritis? How can he have a very good arm when he has osteophytes, which Dr. Levy and every other doctor said predated? How can he have a good arm when he has retracted edge, which has been there and supported by the surgery and the MRI? How can he have a very good arm when he had a significant amount of atrophy, which Dr. Levy and every doctor admitted were there prior to the injury in question? Now, the commission cherry-picked certain parts of Dr. Levy's testimony without looking at his complete testimony, and his complete testimony negates what he said and the opinions that they adopted. Why is that specifically? What does he say that goes against? He had a very good arm, is what the commission adopted. He didn't have a very good arm prior to the injury in question. Levy said he had a very good arm. Levy said he had a very good arm, and that's one of the reasons. Levy said that he must have abducted his arm, yet there's no testimony by the petitioner that he abducted his arm or medical records support. Levy said that he found acute and chronic changes, yet when confronted with his own operative report, was only able to find chronic changes. Levy admitted during his cross-examination that osteophytes take time to develop, not days. He testified that the amount of athropy found by Dr. Schlomberg the day after the surgery takes time to develop, not a day. All of the physicians, Schlomberg, Sagerman, and the radiologist are all consistent. If you took his entire opinion in context with everything he said, it's clearly apparent that the opposite conclusion is true, that this was a preexisting condition. And he questions himself at the very end when he says, well, you know, maybe this isn't, maybe it's the repetitive nature of his job. Well, there's an obligation to pick how you're going to try your case. This was tried as a specific trauma. You have the physician who they're relying on, and the commission doesn't even note that, where he questions his own opinion. I think it's clearly against the manifest weight of the evidence. I think that the only conclusion you could draw based upon all of the evidence, and even if you just take Dr. Levy and look where he contradicts himself, he's not credible. What he says in one sentence is contradicted by his own operative report or by his prior admissions on cross-examination or by his, well, maybe I'm wrong, maybe it's the repetitive nature of his job. This is a case that should be reversed. A clearly opposite conclusion should be drawn. And in terms of just out of interest on the extra scrutiny, if you look at the amendment to the Act, 19E, you will see that no additional evidence was allowed after December 18, 1989, and it was after the three cases cited by the Supreme Court. Now, shouldn't the fact-finding or credibility of witnesses be left to the actual fact-finder, the person who hears it? Isn't that how we do it in the civil arena? Arbitrator Andrews heard testimony over hours and days. He had the opportunity to look at Mr. Meriklin and look at Dr. Schlomberg. It's not the way it's done in administrative review. In administrative review, when a board appoints a hearing officer and the hearing officer makes a finding of fact, the board is not bound by that. They read the transcript. If they come to an opposite conclusion, they list their reasons as to why, and they go on from there. But weren't those Supreme Court cases, Your Honor, all due respect, those were all decided when the commission did actually hear evidence, and 19E was changed after those decisions. Shouldn't that be something that's reviewed again, and shouldn't we give back to the actual fact-finder the ability to judge the credibility? How does the commission judge someone's credibility by reading a transcript? Counsel. That was always a question. I thank you for your time. Okay. Thank you, counsel, for your arguments in this matter. It will be taken under advisement.